Filed 12/29/14  In re K.W. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re K.W., a Person Coming Under the Juvenile Court Law. | B255878 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. CK99783) |
| Plaintiff and Respondent, | |
| v. | |
| T.C., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Akemi Arakaki, Judge.  Affirmed.

Marissa Coffey, under appointment by the Court of Appeal, for Defendant and Appellant.

Richard D. Weiss, Acting County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

Mother T.C. appeals from the juvenile court's jurisdictional findings under section 300, subdivisions (b) and (d) of the Welfare and Institutions Code[1] as to her now six-year-old daughter, K.W. She also challenges the dispositional findings and orders, contending there was no clear and convincing proof she posed a threat to K.W.'s safety. Mother also contends, for the first time in her reply brief, that the juvenile court did not state the factual basis for its finding that the Los Angeles County Department of Children and Family Services (the Department) made reasonable efforts to avoid removal, or for its finding that removal was warranted. Lastly, mother contends the juvenile court abused its discretion when it denied her request for a continuance of the disposition hearing so that the Department could furnish an additional report regarding the visitation between mother and K.W.

We find no merit in any of these contentions. There was substantial evidence that K.W. was the victim of sexual abuse while in mother's care, and because mother did not believe K.W.'s reports of abuse, that mother posed a continuing threat to her safety. Any error in the court's dispositional findings was forfeited and was harmless. Lastly, we find no abuse of discretion in the denial of mother's request for a continuance. We therefore affirm the orders below.

## FACTUAL AND PROCEDURAL BACKGROUND

On May 16, 2013, the Department received an anonymous referral (which months later, father S.W. testified he had made) that K.W. was the victim of emotional abuse by mother, and by mother's male companion, G.I. According to the reporting party, G.I. was prohibited from living in mother's home, but was nonetheless living with mother, and K.W. was left alone with him. The reporting party did not explain, but the Department later learned, that a family law order prevented G.I. from sleeping over at mother's home while K.W. was present. Mother and G.I. threatened "harm" to K.W. if she disclosed the living arrangement.

---

[1] All further statutory references are to the Welfare and Institutions Code.

On May 23, 2013, before the May 16 referral was resolved, the Department received a second referral from a mandated reporter. According to the reporter, K.W. was the victim of sexual abuse by mother and G.I. K.W. told the reporter that mother rubbed and poked K.W.'s vagina, and that G.I. also touched and rubbed K.W.'s vagina while mother was present.

On May 23, a Department social worker interviewed father, K.W., and father's fiancée, C.T. According to father, in April 2013, he and mother received a custody order from family court. Mother told the family court that she lived alone, and when father informed the court about mother's boyfriend, G.I., mother told the court they were no longer seeing each other. In the past, K.W. had told father that she, mother, and G.I. all slept together in the same bed. Father thought the sleeping arrangement was inappropriate. K.W. recently informed father that she now had her own bed at mother's house.

Father sought a custody order because mother's visits with K.W. had been inconsistent, and father had been K.W.'s primary caregiver for the last year. Also, father was concerned because in February, K.W. pulled her shirt up and her pants down in front of other children at school. Father told K.W. that her behavior was "not okay" and told mother about it. Mother did not seem concerned.

A week before the interview with the Department, K.W. told father's fiancée that G.I. had been at mother's house again, and that mother and G.I. threatened K.W. with a "whooping" if she told anyone. Father had tried to address these issues in family court earlier that week, but was unable to obtain any relief because he had no admissible evidence.

Also during the week before the interview, K.W. told father that her private area, which she refers to as her "nego," hurt. Father assumed K.W. had not washed herself properly, and told her to take a shower, after which K.W. told father she felt better, and he did not think anything more of it. The next night, when father was putting K.W. to bed, she asked father if he wanted to touch her private area. Father was "completely shocked," and asked why K.W. would ask him that. K.W. told father that mother and

3

G.I. rubbed her private area before to make it feel better. When G.I. rubbed it, it tickled at first, but it then began to hurt and bleed, and G.I. told K.W. to take a shower.

The following day, father took K.W. to a Los Angeles Police Department station to make a report. Father also took K.W. to the doctor to be examined on May 23, 2013. The doctor found no apparent signs of abuse. Father did not allow mother to have her scheduled visit on May 22.

The Department social worker spoke alone with K.W., and K.W. told her that G.I. is sometimes at mother's home. K.W. told the social worker she feels "happy and safe" in both of her parents' homes. Sometimes she gets in trouble with her father, and he will give her a "whopping" on her butt with his hand. Mother does not "whoop" her and neither does G.I. However, G.I. did throw a pillow at her, which she did not like. K.W. stated that she has everything she needs at both homes, including clean clothes, food, and toys. Mother and G.I. are nice to each other, and she has never seen them fight. Sometimes father and C.T. argue, but they never hurt each other. She has never felt afraid of father, C.T., mother, or G.I. Mother and father are always nice to K.W., and do not say mean things to her.

K.W. told the social worker that her private area is called her "nego," and K.W. pointed between her legs. K.W. said that no one touched her "nego" except for her doctor, who touched it because it was bleeding. K.W. did not know why her "nego" was bleeding. The social worker asked K.W. if mother or G.I. touched her "nego," and she said they had not. K.W. said that she likes G.I., and that he is a "funny person."

K.W. told the social worker that she sleeps in her own bed at father's house, in her own room, and at mother's house, K.W. sometimes shared a bed with mother and G.I. However, they always had their clothes on. Sometimes K.W. felt scared of G.I., because he would make "roar sounds like a tiger" while they were playing. K.W. was not afraid of mother. Sometimes she was afraid of father because he tells her to be quiet.

When asked whether mother or G.I. threatened to give her a "whooping," K.W. responded, "I'm not going to get a whooping from my mom, my mom loves me. My dad

4

loves me too." K.W. also reported that she bathes and goes to the bathroom by herself. K.W. was able to distinguish between the truth and a lie.

When the social worker told father that K.W. had not disclosed any sexual abuse, father was "shocked." Father said that K.W. has changed stories before, and would act nervous and avoidant if father tried to bring up the subject.

Father's fiancée C.T. reported that within the last week, K.W. told her about G.I.'s presence in mother's home. K.W. had casually remarked that G.I. was "funny." K.W. had previously talked about how G.I. was always out of town, and she "shut down" after mentioning that he was funny, stating that was supposed to be a secret. K.W. expressed concern that she would get in trouble with mother. K.W. said mother was going to hit her, and asked C.T. not to tell father.

C.T. confirmed that when K.W. told father her "nego" hurt, they assumed it was a hygiene issue, and had her bathe. When father told C.T. about the abuse, C.T. talked to K.W., and K.W. told her that G.I. touched her "nego." G.I. did it softly at first, and it tickled, but it then began to hurt. Mother also touched K.W.'s "nego," possibly to rub something on it. According to C.T., K.W. was laughing when she discussed the abuse, which troubled C.T.

The social worker interviewed mother over the phone. Mother believed father had made the report because he had a problem with mother dating G.I. Father and G.I. were once close friends, and had known each other for more than 15 years. G.I. was K.W.'s godfather. Father and mother had been separated for two years, and since that time, mother had been dating G.I. Father had a hard time accepting the relationship. Mother has tried to be involved in K.W.'s life over the past two years, but father makes it difficult.

G.I. spent the last weekend with mother and K.W., and mother never told K.W. to keep it a secret. Mother denied that she or G.I. sexually abused K.W. Mother believed father was unhappy with the current custody order, because he wanted full custody and no visitation for mother. Father tried to interrupt mother's visitation, and did not want K.W. to spend Mother's Day with mother, even though mother had a visit scheduled that

5

day. Last Wednesday, father would not allow mother to have her visit, explaining there was "an issue at the school."

According to mother, K.W. has her own bed in mother's house. Before she had a bed, mother and K.W. would share a bed. If G.I. stayed over, he would sleep on the floor.

Mother told the social worker she loves K.W. and would never let anything happen to her. Mother reprimands K.W. verbally, never hits her, and does not allow G.I. to discipline her. Also, G.I. has no involvement with K.W.'s use of the bathroom. K.W. bathes alone, and mother periodically checks on her to ensure she is safe.

The social worker interviewed G.I. over the phone. He was shocked by the allegations, and believed that father led K.W. to say those things. G.I. believed father held a "grudge" against him. They were once close friends, and G.I. was like an older brother to father. G.I. was K.W.'s godfather, and father used to allow G.I. to babysit K.W. Father was upset when G.I. and mother started dating. G.I. admitted to spending time with mother and K.I. the weekend before, but denied spending the night at mother's house. G.I. would sleep at mother's home on nights that K.W. was not there. G.I. admitted that "the parents went to court and the judge mentioned that [G.I.] was not supposed to sleep over when [K.W.] was present, so he was abiding by that until the mother can go back to court to address those issues."

G.I. never threatened K.W. He also never told K.W. to keep any secrets. In the past, when G.I. slept over at mother's home and K.W. was there, K.W. did not have her own bed, and G.I. would sleep on the floor. G.I. has been doing his best to appease father, and G.I. does not want to cause any trouble.

G.I. insisted the sexual abuse allegations were "completely false"; he never touched K.W.'s private area, and mother never sexually abused K.W.

The Department social worker interviewed Lakesha Johnson, the physician assistant who treated K.W. Father brought K.W. in for an examination after she disclosed sexual abuse. Ms. Johnson conducted a physical exam, but was unable to confirm the abuse. K.W.'s hymen was no longer intact, but Ms. Johnson could not

6

conclusively determine whether this resulted from abuse, as there could be other causes. Father described K.W.'s disclosure to Ms. Johnson, and K.W. also told Johnson that "Mr. [G.I.]" "began to rub her while . . . mother watched. [I]t tickled at first, but then the rubbing hurt and she began to bleed." K.W. told Ms. Johnson that "fingers were put inside her." Ms. Johnson believed K.W. may have been digitally penetrated. Ms. Johnson was "very concerned based on [K.W.'s] disclosure and . . . felt that something may be going on that needed more looking into."

The family had no previous child welfare referrals, although mother was the subject of three abuse and neglect referrals when she was a minor.

Mother consented to having K.W. temporarily removed from her care, and placed with father.

An April 29, 2013 minute order from the family court was appended to the Department's detention report. In the minute order, the court had awarded mother and father joint legal custody of K.W., with the primary physical custody going to father. Mother was to have K.W. every weekend, from Friday after school to 6:00 p.m. on Sunday. Mother also was to have K.W. overnight on Wednesdays.

At the June 3, 2013 detention hearing, the juvenile court ordered K.W. to participate in a forensic interview. The juvenile court found father to be K.W.'s presumed father, and found a prima facie case for detaining K.W. under section 300, subdivisions (b) and (d). K.W. was placed with father, and mother was to receive three monitored visits per week. K.W. was to have no contact with G.I.

The Department's July 3, 2013 "Jurisdiction/Disposition" report noted that mother had been declared a dependent when she was a minor, and that jurisdiction had been terminated when mother turned 18 in June 2008.

In a June 21, 2013 interview, mother stated that the allegations of sexual abuse were "completely false." She believed the allegations stemmed from the custody dispute between herself and father, and father intended to reduce mother's contact with K.W. According to mother, father was abusive with her in the past; he would use "profane

language" and "hold her down" if she attempted to leave. Also, father had encouraged mother to abort K.W.

G.I. was interviewed again on June 21, and continued to deny abusing K.W.

K.W. participated in a forensic examination on June 7, 2013, at the Harbor-UCLA Medical Center. K.W. made no "spontaneous" statements during her forensic examination, and the physical examination revealed that her labia, clitoral hood, perihymenal tissues and hymen supine were all within normal limits.

A July 2013 "last minute information for the court" reported that father was interviewed again on June 28. He recounted again how K.W. had disclosed that G.I. and mother had rubbed her "nego." Father told C.T. (now his wife) about the abuse, and C.T. spoke with K.W. K.W. told C.T. that G.I. rubbed K.W.'s "nego" and mother then "rubbed medicine on [K.W.'s] vagina."

According to father, mother resided in a studio apartment with G.I. Father did not like K.W. to stay over at mother's home, because she shared a bed with mother and G.I. Mother did not get a bed for K.W. until father filed his custody petition in family court. Given what father knew about mother's past, he would not "put it past mother" to abuse K.W. Before K.W. told father about the abuse, she complained that her vagina hurt, and that mother had scratched her vagina. Father had assumed mother accidentally scratched K.W. during a bath.

Mother and father dated on and off between 2006 and 2011. When father met mother, she was living in transitional housing. She had mental health issues and would cut herself. She also used drugs. After mother and father ended their relationship in 2011, mother's visitation with K.W. was inconsistent. Mother was absent from K.W.'s life for months at a time. Father filed for full custody in 2012, and mother then became active in K.W.'s life. However, her participation was still somewhat inconsistent; she sometimes missed scheduled weekend visits, and missed K.W.'s birthday party.

C.T. was also interviewed again on June 28. C.T. and father had dated for more than a year. When they started seeing each other, mother was not around. Father tried to initiate telephone contact between mother and K.W. Mother would not call K.W. It

8

appeared to C.T. that mother was not interested in a relationship with K.W. However, after father filed for custody, mother "stepped up" and started to spend time with K.W. However, her renewed commitment to K.W. "did not last."

K.W. told C.T. that she was lying in mother's bed when G.I. rubbed her "nego," and that it tickled. Mother also rubbed medicine on K.W.'s vagina. C.T. denied that K.W. reported that anyone had penetrated her vagina. C.T. believed K.W., and did not think she was making things up.

K.W. was also interviewed again on June 28, and told the Department investigator that things were going well in father's home. When asked what happens when she gets in trouble, K.W. said that "my nego was bleeding, mommy was rubbing it with medicine." When asked *when* mother rubbed medicine on her vagina, K.W. responded "at [C.T.'s] house." When asked *why* mother rubbed medicine on her vagina, K.W. said, "I was touching it cause it was bleeding. . . . I was tired. [G.I.] was rubbing it cause he was a nice guy . . . Safi." When asked what "safi" meant, K.W. responded "that's what you call it (vagina) when it's bleeding." K.W. went on to explain that "[G.I.] was rubbing it really slow and he said be still . . . my mom said stop rubbing it." When asked if someone was encouraging her to report the allegations, K.W. responded, "Yes." During the interview, K.W. was running from room to room, and was inattentive. Because K.W. was distracted and ignored many of the investigator's questions, the investigator ended the interview.

When the investigator conducted a follow-up interview with mother on July 1, mother denied ever rubbing medicine on K.W.'s vagina. She did recall an incident when K.W. was scratching her vagina because it was itching, and mother bathed K.W. and cleaned her vagina. K.W.'s underwear would often have "boo boo stains." Mother believed K.W. was itching because of her panties. Mother was emotional when discussing the allegations, and "vehemently denied" any abuse.

The Department noted that it was "withholding a recommendation until the completion of the forensic interview. [K.W.'s] statements have been inconsistent and it is unclear at this time which statement is factual. It is believed with further evidence from the forensic interview the Department will be able to make a full assessment of the

9

facts of the case and make the appropriate recommendations. The Department is recommending that the matter be trailed for receipt of [K.W.'s] forensic interview."

Consistent with the Department's recommendation, the juvenile court continued the jurisdictional hearing pending the results of the forensic interview of K.W.

The report summarizing the forensic interview was received by the Department on August 28, 2013. According to the report, K.W. "qualified for truth and lie" and "real and not real," but was not able to distinguish between them with examples. K.W. also established her knowledge about body parts by coloring a gingerbread man. When the interviewer asked K.W. why the interview was taking place, K.W. pointed to the genital area of the gingerbread man and stated, "because my nego was bleeding." When asked why her "nego" was bleeding, K.W. responded, "because [G.I.] rubbed it." When asked what G.I. rubbed, K.W. pointed to her vagina and said, "my nego."

The interviewer asked how G.I. rubbed K.W.'s "nego," and K.W. responded, "with his fingers and he made it bleed." K.W. confirmed G.I. placed his fingers "inside" her "nego" and that he touched her underneath her clothes. K.W. said she was watching television when this occurred. G.I. did not touch K.W. anywhere else on her body. K.W. was at mother's house, and mother was present, and put medicine on K.W.'s "nego" "because it was bleeding." K.W. did not respond to questions about whether mother saw G.I. touch her "nego" or whether her "nego" was bleeding before or after G.I. touched her.

K.W. reported that her "nego" "hurt a lot." When G.I. touched K.W.'s "nego" K.W. said, "ouch" and then G.I. "rubbed it softly." After G.I. touched K.W., he took her to the shower. When asked what G.I. did once K.W. was in the shower, K.W. responded, "he touched my nego." When again asked *where* G.I. touched her "nego," K.W. responded, "when I was watching tv [*sic*]."

G.I did not touch K.W.'s "nego" any other time. Mother touched K.W.'s "nego" "to put medicine on it." No other person besides mother and G.I. had touched K.W.'s "nego."

The interviewer attempted to ask other questions, but K.W. kept responding "[G.I.] touched my nego." The interviewer asked K.W. if anyone told her to say that, and she did not respond. The interviewer was unable to engage K.W. further; towards the middle and end of the interview, K.W. kept repeating that G.I. had touched her "nego."

Based on the forensic interview, the Department recommended that the petition be sustained, and that jurisdiction be terminated with a family law order giving father full legal and physical custody of K.W. The Department recommended that mother's visits remain monitored, and that K.W. have no contact with G.I. The Department noted that K.W. initially denied the allegations, but since that time, her reports of the abuse had been consistent.

In a November 2013 "last minute information for the court," the Department reported another conversation with the physician's assistant, Ms. Johnson, to whom father and K.W. initially reported the abuse. Ms. Johnson confirmed that she did not ask leading questions of K.W., and that she did not believe father coached K.W. Father seemed worried and nervous as K.W. was scheduled to return to mother's care, and father wanted to protect K.W. from any further abuse.

In a January 2014 "last minute information for the court," the Department noted that mother had enrolled in parent education, but not any other services. Before November 2013, mother's visits were consistent, but after that time, they became inconsistent due to issues with monitors, and the Department's concerns about mother's monitors. The Department was making "reasonable efforts to accommodate mother's visits. . . ."

On November 15, 2013, the Department investigator made a new child abuse referral after mother sent an email to the investigator stating that K.W. told mother she had been lying. According to the email, K.W. disclosed that C.T. told her to say that G.I. touched her "nego" and that mother rubbed medicine on it. K.W. told mother that G.I. did not touch her "nego" and that mother did not put medicine on it. K.W. also told mother that she wanted to return home with her. According to the email, mother's visitation monitor, I.L., was present when K.W. made her statements. Mother called the

11

Department and took K.W. to the police station to make a report, and K.W. was interviewed, alone, by police. According to mother, the police told her that K.W. disclosed that C.T. told K.W. to make the allegations about mother and G.I. K.W. had gotten in trouble for taking too long in the bathroom, and C.T. was upset and put a "stick" in K.W.'s "nego" and then made K.W. say that G.I. and mother hurt her "nego."

On November 14, the Department investigator spoke with father about the new allegations. Father was cooperative, and the investigator met with father, C.T., and K.W. They all denied the allegations. According to father, on the day mother made her allegations, K.W. returned from a visit with mother and told father that mother promised to make cookies and cake if K.W. told the truth. Father believed mother was influencing K.W. to change her initial report.

On November 19, the Department investigator interviewed the visitation monitor, I.L., over the phone. I.L. has known mother since she was a child in foster care, and ran the group home where mother was placed. He occupies a parental role in mother's life, and he also has a relationship with K.W. I.L. paid for mother's baby shower when she was pregnant with K.W. According to I.L., during a visit with mother that he monitored, K.W. disclosed that C.T. told her to say that G.I. and mother touched her vagina. Mother immediately called the Department and took K.W. to the police station. Mother did not solicit the information from K.W., and did not discuss the case with her. I.L. believed the abuse allegations were false, and resulted from custodial issues between mother and father.

On December 20, the Department investigator received an email from one of the interviewing police officers, Officer Erica Bruner. K.W. told Officer Bruner that "[C.T.] told her to tell the truth about her nego (vagina) and that there was a stick in her vagina and it was bleeding." When asked how the stick got in her vagina, K.W. told Officer Bruner "it was because I was going to the bathroom too long." K.W. continued to say that "[C.T.] told me to tell the truth about my nego." Officer Bruner had a difficult time understanding K.W. given her age.

12

The last minute information also noted, in bold, that the new allegations by mother were made after the Department investigator discussed the Department's current recommendations with mother, and informed mother that the current recommendations "would stand unless new information/evidence was received including the child recanting her statements."

The Department recommended that mother's visits be monitored by a neutral party to protect the integrity of the investigation, after concluding that I.L. was not objective.

The new child abuse referral prompted by mother's email was later closed by the Department as unfounded.

The combined jurisdiction/disposition hearing was held on February 21, 2014. After mother's counsel stated his appearance, mother responded, "I would like to make it clear that [counsel] does not represent me. I am here in my proper person, and I can speak for myself." The juvenile court conducted a *Marsden*[2] hearing, and mother decided to continue to be represented by counsel. However, when the proceedings resumed, mother interjected, and stated that she did "not understand the nature of the cause of action against me; so I would like the court to explain the nature of the action against me. Is it going to be a civil action or is it going to be a criminal action?" The juvenile court explained the proceeding was "quasi civil," and mother stated that "since this is a civil action, I make a motion to dismiss for lack of sworn complaint by an injured party." The juvenile court denied mother's motion.

The Department's reports were admitted into evidence.

K.W. testified in chambers to the following: She understood what it meant to tell the truth, and that you get in trouble when you lie. When asked why she was present in court, K.W. responded that she was there to tell the truth. When asked whether anyone told her what to say, K.W. responded, "Yes." K.W. then clarified that C.T. and her father had told her to tell the truth. They told her the truth is "my navel was hurting with a stick

---

**2**      *People v. Marsden* (1970) 2 Cal.3d 118.

13

and [G.I.] just touched it and he touched it." K.W. was clutching a teddy bear to her mouth as she testified.

When asked if G.I. "really touched [her]," K.W. responded, "Yes." K.W. testified that he touched her "private part." He only touched her one time. K.W. was at mother's house when G.I. touched her, and mother was there. K.W. was sitting in a chair in the living room, and G.I. was on the floor. Mother was in the same room, on the bed. K.W. did not say anything to mother or G.I. when G.I. touched her. K.W. did not know who she first told about the touching, and did not know if she told father about it. When asked whether father told K.W. that G.I. had touched her, K.W. responded, "Yes." Father told K.W. the day she testified, and before, that G.I. had touched her. He told her this approximately four times. C.T. never told K.W. that G.I. touched her.

K.W. testified that she was afraid of G.I. because "he touched [her] private parts." She confirmed that he "really touched" her. He touched her under her clothes.

Father testified he had know G.I. for 15 years. Father denied that he had asked G.I. to be K.W.'s godfather. Father was K.W.'s primary caregiver in 2012, and mother's visitation with K.W. had been inconsistent. Father sought sole legal and physical custody of K.W. in April 2013. The court ordered joint custody to mother and father. Father told the family law court that K.W. was at risk in mother's care. Father was concerned because K.W. had undressed herself at school, and because mother only had one bed in her home which she shared with her boyfriend and K.W. Father had been concerned that K.W. was being sexually abused before she made her disclosure.

During father's testimony, mother suddenly revealed she was using a recording device, interjecting that "[t]his is recording." She was told by the bailiff that recording devices were not allowed in the building, and mother responded, "[t]hat is for the judge to determine." The court instructed mother that recording devices were not allowed. Counsel for the Department asked the court to inquire whether K.W.'s testimony had been recorded. Mother interjected that "[i]t is a public court of record . . . ." The court corrected mother that the proceedings were not open to the public. Mother expressed her

14

concern about ensuring an accurate record. The court confiscated mother's recording device so that any recordings of the proceedings could be deleted.

Father's testimony resumed. He admitted to making the May 16, 2013 referral to the Department. Father denied telling K.W. what to say in court, and only told her to tell the truth. Father denied telling K.W. that G.I. touched her. He last discussed G.I. touching K.W. on the day she disclosed the incident to him. Father admitted he was upset that G.I. started a romantic relationship with mother. However, father never told K.W. to say that G.I. or mother touched her inappropriately.

Mother testified that in 2012, father made visitation with K.W. "very difficult." Father was not consistent in making K.W. available for agreed upon visitation, and did not want K.W. around G.I. because he was upset that he and mother were dating. Mother never touched K.W.'s private area other than to wash her. She was never present when G.I. touched K.W.'s private area, and K.W. never told mother that G.I. had touched her. K.W. told mother that she had been lying, and that C.T. told her to say that G.I. touched her private area. Mother did not believe K.W.'s testimony that G.I. touched her inappropriately.

G.I. testified that he never touched K.W.'s private area.

Counsel for the Department, for father, and for K.W. each asked for the juvenile court to sustain the allegations, arguing that K.W.'s testimony was credible, and her accounts of the abuse had been consistent.

Mother's counsel argued that father and C.T. had coached K.W. to make false disclosures, because father was "enraged" about the relationship between mother and G.I.

The juvenile court found K.W. to be credible, and noted that the case involved a very young child with a perforated hymen who provided consistent accounts of abuse. Therefore, the juvenile court sustained the following allegations:

> "[Under section 300, subdivisions (b) and (d):] On a prior occasion in 2013, the child [K.W.'s] mother['s] male companion, [G.I.], sexually abused the child by fondling and digitally penetrating the child's vagina, causing pain and bleeding to the child's vagina. The mother knew of the sexual abuse of the child by the male companion and failed to protect the

15

child. The mother allowed the male companion to frequent the child's home and have unlimited access to the child. Such abuse of the child by the male companion and the mother's failure to protect the child endangers the child's physical health, safety and well-being, and places the child at risk of physical harm, damage, danger, sexual abuse and failure to protect."

When the juvenile court proceeded to disposition, mother's counsel asked for a continuance to receive "a further report from the Department as to the visitation between the mother and the child and what the visitation orders should be." The Department opposed the request, and sought an order terminating jurisdiction with a family law order. Alternatively, if the juvenile court maintained jurisdiction, the Department recommended services for both parents and K.W., and stated its view that mother had suggested some acceptable monitors for visitation, and that mother should be allowed reasonable supervised visits with K.W.

The juvenile court denied the request for a continuance, and ordered K.W. removed from mother and placed with father. The court maintained jurisdiction, and ordered that the parents participate in a co-parenting program, Parents Beyond Conflict. Mother was ordered to participate in parenting classes, sexual abuse awareness counseling, and individual counseling. She was to receive monitored visits, three times a week, for three hours each visit, with a Department approved monitor.

Mother filed a timely notice of appeal.

## DISCUSSION

### 1. Jurisdictional Findings

"In reviewing the sufficiency of the evidence on appeal, we look to the entire record to determine whether there is substantial evidence to support the findings of the juvenile court. We do not pass judgment on the credibility of witnesses, attempt to resolve conflicts in the evidence, or determine where the weight of the evidence lies. Rather, we draw all reasonable inferences in support of the findings, view the record in the light most favorable to the juvenile court's order, and affirm the order even if there is other evidence that would support a contrary finding. [Citation.] . . . [Citation.] The

16

appellant has the burden of showing that there is no evidence of a sufficiently substantial nature to support the order." (*In re Cole C.* (2009) 174 Cal.App.4th 900, 916.)

In relevant part, section 300, subdivision (b) allows the juvenile court to take jurisdiction where the child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of [the parent] to adequately supervise or protect the child . . . ." Subdivision (d) allows the court to take jurisdiction if a parent "failed to adequately protect the child from sexual abuse when the parent . . . knew or reasonably should have known that the child was in danger of sexual abuse."

Mother does not dispute that the alleged conduct meets the requirements of section 300, subdivisions (b) and (d). She argues, instead, that K.W.'s testimony was not credible, as she first denied that any abuse occurred, later alleged abuse, later recanted the abuse, and then testified that father told her to say G.I. touched her. Mother urges that the evidence clearly demonstrates that father and C.T. coached K.W. to lie about the abuse. Mother is asking this court to reweigh the evidence, and to second guess the juvenile court's conclusion that K.W. was credible. Under the applicable standard of review, it is irrelevant that some other trier of fact theoretically might have concluded K.W. was coached and lied about the abuse. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.) Here, the Department's reports and K.W.'s testimony provided more than enough evidence to support the jurisdictional findings that were actually made.

## 2. Dispositional Findings

Mother contends that the juvenile court's order removing K.W. from her care is not supported by clear and convincing evidence. She contends the abuse only occurred once, the evidence showed that G.I. no longer stayed over at mother's home, and therefore there was no continuing threat to K.W.'s safety. Moreover, for the first time in her reply brief, mother contends the juvenile court did not state the facts supporting its conclusion that removal was necessary on the record.

A child may not be removed from a parent unless there is clear and convincing evidence of "substantial danger to the physical health, safety, protection, or physical or

17

emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).) A juvenile court's removal order is reviewed under the substantial evidence standard of review, notwithstanding the evidentiary standard used at trial. (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193; see also *In re E.B.* (2010) 184 Cal.App.4th 568, 578 ["The clear and convincing standard was adopted to guide the trial court; it is not a standard for appellate review. [Citation.] The substantial evidence rule applies no matter what the standard of proof at trial."].)

Here, mother testified that she did not believe K.W.'s testimony that G.I. had molested her. Moreover, there was evidence in the record that G.I. stayed over at mother's house in violation of a family law order, and that mother coached K.W. to recant the abuse allegations. Mother's unstable and erratic behavior at the hearing was also cause for concern. There was substantial evidence that mother could not adequately protect K.W. from further abuse (abuse which she denied ever occurred).

As to mother's argument that the juvenile court did not state the factual basis for its finding that the Department made reasonable efforts to avoid removal, or for its finding that removal was warranted, "we will not address arguments raised for the first time in the reply brief . . . ." (*Provost v. Regents of University of California* (2011) 201 Cal.App.4th 1289, 1296.) And, even if we were to consider the argument on its merits, the record here more than amply supports the juvenile court's conclusion that there were no less drastic means to protect K.W. Even if the juvenile court failed to make an adequate record supporting its removal order (a finding we do not make), any error would be necessarily harmless. (§ 361, subd. (d); Cal. Rules of Court, rule 5.695(e); see also *In re Ashly F.* (2014) 225 Cal.App.4th 803, 810-811.)

### 3. Request for a Continuance

Mother requested a continuance of the disposition hearing to receive an additional report from the Department regarding mother's visitation with K.W. On appeal, mother contends a continuance was warranted, as the Department's reports indicated that

mother's visitation was not consistent because the Department did not approve of mother's monitor. According to mother, a continuance would have provided the parties, and the court, with "an opportunity to evaluate how often [K.W.] could visit with Mother, whether there could be a liberalization of those visits, address . . . the 'monitor issues[,]' and whether Father was adhering to the juvenile court's visitation orders . . . ."

Continuances are discouraged in dependency cases. (*In re Giovanni F.* (2010) 184 Cal.App.4th 594, 604.) They are granted only "upon a showing of good cause" as demonstrated by evidence presented at the hearing. (§ 352, subd. (a).) The juvenile court must consider the best interests of the child before granting a continuance, including the child's need for a prompt resolution of her custody status, the need to provide her with a stable environment, and the damage caused by prolonged temporary placements. (*Ibid.*) The denial of a request for a continuance is reviewed for an abuse of discretion. (*In re David H.* (2008) 165 Cal.App.4th 1626, 1635; *Giovanni F.*, *supra*, at p. 605.)

The juvenile court had broad discretion to consider mother's request, and we can find no abuse here. The record below simply does not reveal "good cause" for a continuance of the disposition hearing. The case had dragged on for approximately nine months, awaiting the results of the forensic examination and interview. Moreover, it is unclear what effect an additional report would have on the disposition of the case, as none of the parties contended that mother should not receive visitation. Lastly, mother was not prejudiced by the denial of her request, as the juvenile court retained jurisdiction, and visitation could be addressed if issues arose in the future.

### DISPOSITION

The orders are affirmed.


GRIMES, J.

We concur:

RUBIN, Acting P. J.


FLIER, J.


19